Rockingham
No. 2005-357

DAIMLERCHRYSLER CORPORATION

v.

DARREN VICTORIA

Argued: February 22, 2006
Opinion Issued: June 14, 2006

*The Rose Law Firm, PLLC*, of Albany, New York (*G. Christopher Gleason* on the brief and orally), for the petitioner.

*Kelly A. Ayotte*, attorney general (*Elyse S. Alkalay*, attorney, on the brief and orally), for the State of New Hampshire New Motor Vehicle Arbitration Board, as *amicus curiae*.

DALIANIS, J. The petitioner, DaimlerChrysler Corporation, appeals the decision of the Superior Court (*Morrill*, J.) affirming the new motor vehicle arbitration board's (board) award to the respondent, Darren Victoria (consumer), for his defective automobile. We vacate in part and remand.

The trial court found or the record supports the following facts. On December 30, 2003, the consumer purchased a 2004 Dodge Neon SXT from Rochester Dodge in Rochester (dealer), an independent authorized

DaimlerChrysler dealer. The manufacturer's suggested retail price of the vehicle was $15,990. The sale of the vehicle was memorialized in an agreement executed by both parties, commonly known as a "vehicle cash purchase agreement" or "buyer's order." The vehicle cash purchase agreement indicates that the "sale price" of the vehicle was $15,600. As part of the transaction with the dealer, the consumer "traded in" a 1999 Dodge Caravan. The agreement indicates that the "allowance for used car as appraised" was $4,300. At the time of the transaction, however, the consumer owed an outstanding balance on the trade-in vehicle in the amount of $8,096.96; thus, the trade-in vehicle had "negative equity." The consumer and the dealer entered into a separate agreement concerning the financing of the transaction, entitled "Retail Installment Contract and Security Agreement." On the retail installment contract, the dealer documented the value of the trade-in vehicle as $8,300. This value, which was substantially higher than the trade-in vehicle's appraisal, was designed to conceal the negative equity on the trade-in vehicle in order to enable the consumer to obtain a new loan. The dealer then inflated the purchase price of the new vehicle and documented the inflated "vehicle price" on the retail installment contract as $19,002.04.

On April 22, 2004, the consumer filed a demand for arbitration with the board, pursuant to RSA chapter 357-D, requesting a refund because oil was continually leaking into the coolant system of the vehicle, a problem that he had attempted to have repaired by the dealer three times. The petitioner, as vehicle manufacturer, countered that the consumer was not entitled to a refund because he had tampered with the vehicle. After a hearing, the board concluded that there was no tangible evidence that he had tampered with the vehicle and that its deficiencies were "the result of a manufacturer's defect," which substantially impaired the use and market value of the vehicle. The board granted the consumer's request for a refund and calculated the "Purchase Price of [V]ehicle" in the amount of $19,002.04, the vehicle price listed in the retail installment contract. The dealer was exempt from any liability or contribution. *See* RSA 357-D:1, :8 (1995).

The petitioner appealed to the trial court, pursuant to RSA 357-D:6, I (c), arguing only that the board exceeded its powers when it determined that the purchase price of the vehicle was $19,002.04. The trial court denied the consumer's motion to dismiss, relying upon RSA 357-D:6, I (c) (1995) to state: "If the Board ordered a refund that is more than the [consumer] actually paid for the vehicle as calculated pursuant to RSA 357-D:3, V, then the Board exceeded its powers." The trial court eventually concluded, however, that the petitioner did not prove by clear and convincing evidence that the board exceeded its powers. The trial court

ruled: "As a policy, the Board adopts the manufacturer's agent's vehicle price listed in the retail installment contract when calculating the full purchase price in accordance with [RSA 357-D:3] .... Under the circumstances, this interpretation of the statute and the Board's duties is reasonable and practical." Accordingly, the trial court denied the petitioner's appeal.

On appeal, the petitioner argues before us that the board exceeded its powers when it: (1) adopted the purchase price of the vehicle from the retail installment contract; and (2) refused to consider evidence as to the actual purchase price of the vehicle. The consumer did not participate in the proceedings before this court. The board participated by brief and orally as *amicus curiae*.

We first address the petitioner's contention that the board exceeded its powers by ignoring RSA 357-D:3, V (1995) when it adopted the purchase price of the vehicle from the retail installment contract. The board counters that its practice of adopting the vehicle purchase price listed in the retail installment contract was reasonable and practical, given its claimed inability to distinguish between the actual purchase price and a purchase price inflated to conceal negative equity in a trade-in vehicle.

The trial court's review of decisions of the board is governed by RSA 357-D:6, I, which provides, in relevant part: "The decision of the board shall be final and shall not be modified or vacated unless, on appeal to the superior court, a party to the arbitration proceeding proves, by clear and convincing evidence, that . . . [t]he board exceeded its powers." RSA 357-D:6, I (c). We will not disturb the trial court's decision unless it is unsupported by the evidence or legally erroneous. *Conservation Law Found. v. N.H. Wetlands Council*, 150 N.H. 1, 4 (2003).

To resolve the issue on appeal, we must interpret RSA 357-D:3, V, a provision commonly known as the "Lemon Law," which authorizes the board to refund a consumer's full purchase price for a new motor vehicle that does not conform to warranty. *See* RSA 357-D:1, :3 (1995). This court is the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *DeLucca v. DeLucca*, 152 N.H. 100, 103 (2005). In interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.*

RSA 357-D:3, V states, in pertinent part:

In those instances in which a refund is tendered, the manufacturer shall refund to the consumer *the full purchase price as indicated in the purchase contract* and all credits and

allowances for any trade-in or down payment, license fees, finance charges, credit charges, registration fees, and any similar charges and incidental and consequential damages or, in the case of leased vehicles, as provided in paragraph IX.

RSA 357-D:3, V (emphasis added). Thus, RSA 357-D:3, V directs the board to adopt the "full purchase price" as set forth in the "purchase contract." The petitioner argues that the "purchase contract" means "the agreement for the sale of the vehicle which is binding upon the parties." The board counters that we should, consistent with its "long standing administrative interpretation," construe "purchase contract" to mean the "retail installment contract." The board does not explain how the plain language of the statute supports such a construction. RSA chapter 357-D does not define "purchase contract," nor has the legislature defined that phrase in any analogous statutory context. While the phrase "purchase contract" is also not defined by the definitional resources commonly relied upon by this court, "purchase," in isolation, can mean "the act or an instance of buying," BLACK'S LAW DICTIONARY 1270 (8th ed. 2004), and "contract" can mean "an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law," *id.* at 341.

The legislature defined "retail installment contract," by contrast, in RSA chapter 361-A, governing retail installment sales of motor vehicles, to mean, "an agreement pursuant to which the title to, the property in, or a lien upon the motor vehicle, which is the subject matter of a retail installment transaction, is retained or taken by a sales finance company indirectly from a retail seller or directly from a retail buyer, as security . . . for the retail buyer's obligation." RSA 361-A:1, X (Supp. 2005). As a general principle of statutory construction, we presume that the legislature knew the meaning of the words it chose, and that it used those words advisedly. *Starr v. Governor*, 151 N.H. 608, 610 (2004). Had it intended to define a "purchase contract" as a "retail installment contract," it could have expressly done so, especially where it included that term in an analogous statutory context prior to the re-enactment of RSA 357-D:3. *See* RSA 361-A:1, X; *see also* Laws 1961, 193:1.

■ RSA 357-D:1, entitled "intent," also supports the petitioner's interpretation:

[M]anufacturers, distributors and importers of new motor vehicles should be obligated to provide speedy and less costly resolution of automobile warranty problems. Manufacturers should be required to provide in as expeditious a manner as possible *a refund of the consumer's purchase price,* payments to

> a lessor and lessee, or a replacement vehicle that is acceptable to the consumer whenever the manufacturer is unable to make the vehicle conform with its applicable warranty. New motor vehicle dealers and used motor vehicle dealers cannot be sued under this chapter.

RSA 357-D:1 (emphasis added). RSA 357-D:1 suggests that the Lemon Law is remedial in nature, and not punitive, as it was designed to refund "the consumer's purchase price" for a new motor vehicle that does not conform to warranty. There is nothing in the plain language of RSA 357-D:1 that suggests that the legislature intended for a prevailing consumer to enjoy a windfall thereunder. Although the board's interpretation of the statute is given some weight, *see N.H. Dep't of Rev. Administration v. Public Emp. Lab. Rel. Bd.*, 117 N.H. 976, 977 (1977), its interpretation here, permitting a Lemon Law refund to be based upon the admittedly inflated figures in the retail installment contract, would be contrary to legislative intent as discerned from the statutory scheme, as it could place the consumer in a significantly better position than he or she was in prior to buying the vehicle.

■ The board argues, however, that it had to award the inflated vehicle price in the retail installment contract to make the consumer "whole," as contemplated by RSA chapter 357-D. Specifically, it argues that "the consumer was in the possession of a used motor vehicle before the trade-in .... At the time of an arbitration refund, the manufacturer will most probably not be able to obtain the used car the consumer tendered to the dealer as part of the contract." While RSA 357-D:3, V directs the board to refund to a prevailing consumer, among other things, "the full purchase price as indicated in the purchase contract and all credits and allowances for any trade-in or down payment," the statute issues no explicit directive to refund an amount sufficient to reacquire the original trade-in vehicle. We invite the legislature to clarify RSA chapter 357-D if our interpretation is inconsistent with its intent.

■ The board further contends that disregarding the retail installment contract would be tantamount to "condoning the manufacturers' and the dealers' unlawful and unfair practice[]" of improperly documenting negative equity. It relies upon *Thompson v. 10,000 R.V. Sales, Inc.*, 31 Cal. Rptr. 3d 18 (Ct. App. 2005), to support its position. In *Thompson*, a California court of appeal upheld an injunction against an RV dealer, preventing it from including negative equity "in the cash price of vehicles being purchased," as the practice violated the California Automobile Sales Finance Act, Cal. Civ. Code § 2982 (Deering 1998), and its corresponding

federal regulation, 12 C.F.R. § 226.1 (2005) (revised January 1, 2006). *Id.* at 23, 36-37. The propriety of this practice, however, is not before this court for review. Moreover, as the petitioner points out, it is RSA chapter 357-C, entitled "Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers," and not the Lemon Law, that prohibits unfair and deceptive practices by manufacturers and dealers. RSA 357-C:3 (Supp. 2005). RSA 357-D:3, V explicitly directs the board to refund the "full purchase price," which necessarily contemplates only the actual amount required to purchase the vehicle rather than an inflated value bearing no relationship to the actual cost to the consumer.

■ Finally, the board argues: "[W]hile a consumer may be in a superior position after a refund . . . as compared to the consumer's position prior to the contract, manufacturers are in the unique position to restrain their agents (namely, the dealers) through their contractual relationships from executing undisclosed negative equity contracts." The petitioner counters that it has no agency relationship with the dealer, although the record is silent on that issue. The petitioner also contends that it is prevented by statute from attempting to restrain its independent dealers in the manner suggested by the board because RSA chapter 357-C strictly regulates the contractual relationships between manufacturers and their independent authorized dealers. We need not reach the merits of these arguments for, as addressed above, the propriety of the financing transaction in this case is not before us. Thus, in the absence of an explicit legislative directive, we decline the board's request to transform the Lemon Law into a mechanism for policing such practices between a dealer and consenting consumer. Accordingly, we conclude that the board exceeded its powers by adopting the inflated vehicle price as set forth in the retail installment contract.

We next address the petitioner's contention that the board exceeded its powers by "refusing to consider evidence presented at the hearing as to the actual purchase price of the vehicle." Specifically, the petitioner argues that the board refused to consider the vehicle price listed in the vehicle cash purchase agreement. The record reveals, however, that the board permitted the petitioner to introduce into evidence the vehicle cash purchase agreement. The board did not expressly acknowledge the vehicle cash purchase agreement in its findings of fact or rulings of law and the record is silent as to whether it actually "considered" the vehicle cash purchase agreement. Consequently, we vacate in part, as the board exceeded its powers by adopting the inflated vehicle price as set forth in the retail installment contract, and remand to the board for a

determination of the "full purchase price as indicated in the purchase contract," RSA 357-D:3, V, in a manner consistent with this opinion.

*Vacated in part and remanded.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.